## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (the "Agreement") executed as of December 31, 2010 (the "Effective or Closing Date"), entered into by and between Intercare Specialty Risk Insurance Services, Inc. a California corporation ("Intercare") and PRM Insurance Services, a California corporation ("PRM), Gene Marsh an officer, director and stockholder of PRM ("Marsh"), Donald Steinmeyer as officer, director and stockholder of PRM ("Steinmeyer"). Intercare, PRM, Marsh and Steinmeyer may be referred to collectively herein individually as a "Party" or collectively as the "Parties".

### RECITALS

WHEREAS, the Parties desire to enter into this Agreement pursuant to which, among other things, Intercare will acquire from PRM and PRM shall transfer to Intercare the entire book of business and goodwill of PRM, in exchange for the consideration recited herein.

WHEREAS, the Parties acknowledge that the President of Intercare, Kevin Hamm, has in fact managed the daily operation of PRM in the 18 months preceding the Effective Date, and has had access to the financial information of PRM;

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements set forth below, and for other good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree as follows:

### AGREEMENT

1.   Property Purchased and Sold.  On the basis of the representations and warranties and for the consideration and subject to the terms and conditions set forth below, PRM will convey, assign, transfer and deliver to Intercare and Intercare agrees to acquire, receive and accept assignment, transfer and delivery from PRM the assets described below, collectively called the "Property":

a.  All of the right, title and interest of PRM in insurance and consulting clients, Worker's Compensation consulting, insurance brokerage and insurance agency business and in their insurance counseling, safety planning, insurance program management, insurance claims adjusting and processing and related services businesses (collectively the "Book of Business") and all of their customer lists, expirations, renewal rights, insurance company agreements, and accounts and all books and records, correspondence, files and other data wherever located pertaining to the Book of Business. The Book of Business shall include customer lists, renewal rights, claims, commissions, agreements and contracts relating to the Book of Business which is held, owned or standing in the name of any officer, employee, agent, stockholder or director of PRM.  However, PRM shall retain all interest in any tax loss carry forward that has accrued prior to the effective date of this Agreement.

b.  All of the right, title and interest of PRM in and to the use of name "PRM Insurance Services" or any substantially similar variant thereof, exclusive of the use of the name in securing any of the tax benefits referenced in paragraph 1.a. above;

c.  The sole right to collect and to retain (i) all insurance commissions (including gross retained commissions realized from premiums collected) due PRM, irrespective of the attachment date or billing date of the insurance policies to which such commissions related and whether billed to client by PRM or directly billed to client by the insurance carrier; (ii) all service fees due PRM for any services rendered in connection with the operation of the Book of Business and collected on and after the Closing Date as defined below, by Intercare or by PRM; and (iii) all other commissions, fees or other compensation paid, payable or due to PRM irrespective of the date as of which such commissions, fees or other compensation was accrued or earned.

d. The sole right to collect and retain (i) all contingent commissions or similar compensation due to PRM on and after the Closing Date from insurance

underwriters in connection with contracts or other arrangements in effect on the Closing Date providing for such payments to PRM, and (ii) all return premiums or other payments (return or otherwise) due to PRM from insurance companies.

e. All of PRM's right, title and interest in and to the contracts and agreements listed and described as follows: leases, contracts and agreements: SeaBright and Majestic commissions based on new policies written after December 31, 2010; PRM copier agreement, PRM server lease.

f. All other property, personal and mixed, tangible and intangible, of PRM including cash and securities, bank accounts, accounts receivable of all types and all of PRM's right, title and interest in and to all claims, licenses, trademarks, trade names, copyrights, websites, URLs and memberships (to the extent such are assignable) of PRM, but excluding any tax loss as specified in paragraph 1.a. above.

g. All right, title and interest of PRM in and to the independently developed close personal and ongoing business relationships, trade secrets and knowledge in the insurance industry, through the personal ability, personality, reputation, skill and integrity (the "Goodwill").

h. The transfer and delivery of the Property shall be made free and clear of all liabilities, obligations and encumbrances whatsoever, except those liabilities, obligations and encumbrances expressly assumed by Intercare as set forth now: the Marsh Promissory Note as identified within Section 4c below; the Steinmeyer Promissory Note as identified within Section 4d below; the Steinmeyer Treasurer Agreement as identified within Section 4e below; the Unpaid PRM Brokers' Commissions as identified within Section 4b below; the Legion Stipulated Judgment as identified within Section 4a below; the Wells Fargo Line of Credit as identified within Section 4f below; the Equipment Lease as amended October 10, 2010 between PRM as Lessee and Gene Marsh as Lessor (the "Marsh Airplane

Lease"); errors and omissions tail coverage for PRM for acts occurring prior to January 1, 2011.

i. PRM hereby agrees to cause all such officers, employees, agents and directors to take all necessary action to execute and deliver all assignments, documents, bills of sale and other papers as Intercare may reasonably request in order to transfer all right, title and interest in any of the Property. Note : Assets Retained by PRM: retained assets of PRM: (i) the minute books, stock ledgers and stock transfer records of PRM; (ii) this Agreement and all documents to be delivered by Intercare to PRM hereunder; and (iii) all PRM tax loss carry-forward accrued by PRM prior to and including December 31, 2010.

2. Assumption of Certain Liabilities of PRM. Subject to the terms and conditions of this Agreement, Intercare shall assume and be responsible for:

a. Only (i) those debts, obligations and liabilities of PRM which are included in the liabilities set forth herein, as they may be increased or diminished in the ordinary course of business by the Closing Date; provided, however, that such liabilities have not materially increased prior to the Closing Date without a commensurate increase in current assets, and (ii) the obligations and liabilities of PRM under contracts and agreements listed and described above; and as further specified to be: the Unpaid PRM Broker Commission limited to $400,000 for business booked prior to 12/31/2009; the Marsh Promissory Note; the Steinmeyer Promissory Note; the Steinmeyer Treasurer Agreement; the Legion Stipulated Judgment; the Wells Fargo Line of Credit; the Marsh Airplane Lease.

b. Without in any manner affecting the limitations on the obligations to be assumed by Intercare but rather to identify more particularly certain obligations of PRM which are not to be assumed by Intercare on the Closing Date, it is agreed that Intercare shall not assume nor be liable for, and PRM expressly agrees to remain liable for the following described liabilities, obligations, contracts and commitments:

(i) All liabilities of PRM whether absolute, accrued, contingent, or otherwise, for federal, state, county, local, foreign or other income, franchise, sales, use or other taxes or assessments of any kind (whether or not now asserted or determined) with respect to any period ending on or prior to the Closing Date and all penalties and interest with respect to any such taxes and assessments;

(ii) All liabilities (including legal and accounting fees) of PRM based upon or arising out of the execution, delivery or performance of PRM under this Agreement, the consummation by PRM of the transactions contemplated hereby, or any action related to any of the foregoing, including all liabilities of PRM for federal, state, county, local, foreign or other income, sales, use or other taxes or assessments of any kind (including any penalties or interest thereon) based upon, or related to, the sale and transfer of the Property or any action related to any of the foregoing;

(iii) All liabilities of PRM, whether absolute, accrued, contingent or otherwise, to any other present or former stockholder, director, officer, employee or agent of PRM and any and all contracts or agreements with such persons (including any liability of PRM for severance amounts or dividends whether accrued, declared or otherwise);

(iv) All debts, obligations, contracts and liabilities of PRM to the extent they are in violation of or contrary to any of the representations and warranties, covenants or agreements of PRM contained in this Agreement or any statement or certificate of PRM to be furnished to Intercare pursuant to this Agreement in connection with the transactions contemplated hereby;

(v) All other liabilities, obligations, and contracts and commitments arising out of the ownership and operation of the business of PRM prior to the Closing Date to the extent not expressly agreed to be assumed by Intercare hereunder, including without limitation any liability for errors and omissions whether

asserted before or after the Closing Date which arises out of the operations of the business of PRM prior to the Closing Date (in connection with such liability, PRM acknowledges that it has been advised by Intercare to maintain its own insurance coverage with respect thereto);

(vi) All liabilities of PRM of any kind whatsoever arising on or after the Closing Date;

(vii) Any other debt, obligation, contract or liability of PRM (or its officers or directors) which Intercare has not expressly agreed to assume pursuant to Section 2(a) of this Agreement;

3. <u>Closing.</u> The closing for the transactions contemplated by this Agreement shall be effective for all purposes on December 31, 2010 (the "Closing Date").

4. <u>Purchase Price</u>. The purchase price shall be comprised of the following components of consideration, the sufficiency of which is hereby acknowledged by the Parties:

a. <u>Legion Stipulated Judgment</u>. Intercare will assume the obligation of PRM to Legion under that certain Stipulation of Judgment dated December 18, 2007, in the approximate balance of ninety five thousand dollars ($95,000.00) payable in installments of five thousand dollars ($5,000.00) per month (the "Legion Stipulated Judgment"). The final payment of the Legion Stipulated judgment to be paid by PRM will be $35,000 on December 31, 2010.

b. <u>Unpaid PRM Broker Commissions</u>. PRM has an undetermined amount of unpaid commissions due to Brokers (the "Unpaid PRM Broker Commissions") for business booked prior to 12/31/2009. Intercare agrees to deposit to an account (the "PRM Broker Commissions Account") the amount of five thousand dollars ($5,000.00) per month commencing January 2011 for a period of eighteen (18)

months, and thereafter increase the monthly deposit to ten thousand dollars ($10,000.00) per month for a period of forty two (42) months, subject to a maximum of total deposits by Intercare to the PRM Broker Commission Account of four hundred thousand dollars ($400,000.00). The PRM Broker Commissions Account shall be managed and administered by Intercare. Intercare shall have sole discretion in the selection of which PRM Brokers to negotiate and pay from the PRM Broker Commissions Account. Intercare agrees to inform PRM of which PRM Broker Commissions have been selected to be approached by Intercare and may request the cooperation of PRM from time to time in this process. The obligation of Intercare to continue deposits to the PRM Broker Commission Account will cease upon payment by Intercare of four hundred thousand ($400,000) or sooner in the event of mutual agreement between PRM and Intercare that the PRM Broker Commissions have been satisfied.

c. Marsh Promissory Note.  Intercare will assume the financial obligation of PRM  under that certain promissory note dated January 4, 2008 payable to Gene Marsh in the principal amount of four hundred seventy five thousand dollars ($475,000.00) with an approximate principal balance of four hundred twenty thousand dollars ($420,000.00) (the "Marsh Promissory Note"). The Marsh Promissory Note will be amended to revise the term of payment to ten (10) years from the Effective Date and the monthly payments shall be fully amortized, principal and interest, commencing January 1, 2011.

d. Steinmeyer Promissory Note. Intercare will assume the financial obligation of PRM under that certain promissory payable to Don Steinmeyer (the "Steinmeyer Promissory Note").  The Steinmeyer Promissory Note will be amended to revise the term of payment to ten (10) years from the Effective Date and the monthly payments shall be fully amortized, principal and interest, commencing January 1, 2011.

e. Steinmeyer Treasurer Agreement.    Intercare will assume the financial obligation of PRM under that certain agreement dated April 17, 2009 with Donald Steinmeyer to provide services as the PRM Treasurer through April 2014 ("Steinmeyer Treasurer Agreement"). The Steinmeyer Treasurer Agreement will be canceled as of the Effective Date and the remaining balance payable to Steinmeyer under the Steinmeyer Treasurer Agreement will be incorporated into the compensation paid to Steinmeyer in the Steinmeyer Consulting Agreement.

f. Wells Fargo Line of Credit. Intercare will assume the financial obligation of PRM under Wells Fargo Line of Credit account numbers 5474-6431-7155-3921 and 5474-6331-7155-3468 (the "Wells Fargo Lines of Credit") in the approximate unpaid balance of thirty thousand dollars ($30,000.00).

5. SeaBright Profit Sharing Fund.  The SeaBright Profit Sharing fund ("SPSF") for premiums written by PRM through December 31, 2010 is anticipated to be disbursed by SeaBright in several installments over a period several years commencing or about November-December 2011. The SPSF proceeds shall be divided evenly between PRM and Intercare distributed as follows:

a. The PRM portion of the SPSF distributions shall be used as follows:

First; to resolve and pay remaining PRM Broker Commission claims;

Second: to unpaid PRM expenses.

Third: Any remaining balance after offsets/deductions/payments for PRM Broker Commission claims and for the Administrative Expenses shall be returned to PRM.

b. Intercare portion of the SPSF distributions shall be used as follows:

First: up to a maximum of four hundred thousand dollars ($400,000.) shall be used to pay PRM Broker Commissions Claims;

Second: Intercare shall have the option to pay off any remaining PRM Administrative Expenses that Intercare would be obligated to pay under this Agreement.

6. Consulting Agreements. Intercare will enter into consulting agreements with Gene Marsh ("Marsh Consulting Agreement") and Donald Steinmeyer ("Steinmeyer Consulting Agreement) each for a term of ten (10) years. The Marsh Consulting Agreement shall provide for monthly compensation to Gene Marsh of approximately seven thousand eight hundred twenty one dollars ($7,821.00) per month throughout the term of the Marsh Consulting Agreement. In addition to the compensation payable to Marsh under the Marsh Consulting Agreement, Marsh shall also receive payments as follows: (i) Airplane Lease of three thousand dollars ($3,000.00) per month for the term of this Agreement; (ii) Marsh Promissory Note of one thousand four hundred twenty nine dollars ($1,429.00). The sum total of payments to Marsh shall be twelve thousand two hundred fifty dollars ($12,250.00) per month.   The $12,250.00 monthly compensation (as adjusted for inflation or deflation) is fully assignable by Marsh and shall be paid by Intercare, its successors or assigns for the full ten-year term to Marsh or his heirs and assigns in the event of his death prior to January 1, 2021.

The Steinmeyer Consulting Agreement shall provide for monthly compensation to Donald Steinmeyer of approximately one thousand four hundred eighty two ($1,482.00) per month throughout the term of the Steinmeyer Consulting Agreement. In addition to the compensation payable to Steinmeyer under the Steinmeyer Consulting Agreement, Steinmeyer shall also receive payments as follows: (i) the Steinmeyer Promissory Note and (ii) the Steinmeyer Treasurer Agreement. The sum total of payments to Steinmeyer shall be five thousand five hundred dollars ($5,500.00) per month.   The $5,550.00 monthly compensation (as adjusted for inflation or deflation) is fully assignable by

Steinmeyer and shall be paid by Intercare, its successors or assigns for the full ten-year term to Steinmeyer or his heirs and assigns in the event of his death prior to January 1, 2021.

The "adjustment for inflation" referenced in the preceding two paragraphs shall be calculated every 30 months after January 1, 2011 to compensate Marsh and Steinmeyer for inflation in the Consumer Price Index, or Intercare for deflation if same, as reported by the Wall Street Journal on those dates. The maximum increase or decrease shall be limited to five (5) percent for any 30 month period.

7. <u>Acquisition of PRM Shares from PRM Stockholders</u>. Intercare agrees to acquire PRM shares of PRM common stock from the following PRM Stockholders and the corresponding rights of the PRM Stockholder's shares held by the PRM ESOP for the benefit of the PRM Stockholders named below in consideration of Intercare issuing Intercare Preferred Non-Voting Shares in monthly increments over a period of ten (10) years commencing January 1, 2011, as follows:

| PRM Stockholder | Value of Intercare Shares Issued Monthly |
|---|---|
| Dan Wyatt | $1500.00 |
| Larry Allen | $300.00 |
| Robert Campbell | $300.00 |
| Dean Pastor | $150.00 |

The shares of Intercare Preferred Non-Voting Shares issued to the PRM Stockholders shall be subject to the terms and conditions of Intercare's Bylaws, Buy-Sell Agreement and other policies that may be adopted by Intercare restricting the transfer of such shares of stock. All PRM shares so acquired by Intercare will be transferred to PRM in consideration of ten dollars ($10.00).

8. <u>Administration Expenses</u>. Commencing January 2011, Intercare agrees to pay to PRM the sum of two thousand five hundred dollars ($2,500.) per month for a period of eighteen (18) months ("PRM Administrative Expenses") The Parties agree that PRM shall have access to and discretion for the use of two thousand dollars ($2,000.00) per month of the PRM Administrative Expense fund. The remaining five hundred dollars ($500.00 per month of the PRM Administrative Expense fund shall be held by Intercare for disbursement at the direction of PRM in closing out the PRM ESOP. After the initial eighteen month term, the monthly payment of the PRM Administrative Expense fund shall be increased to four thousand dollars ($4,000.) per month for a period of forty two (42) months Payments by Intercare under this Section 6 may be terminated by Intercare prior to the payment terms identified herein if the obligations payable as PRM Administrative Expenses are satisfied before the end of the stated term.

9.  <u>Bill of Sale</u>. To effect the conveyance and transfer of the Property, PRM will execute a Bill of Sale and Assignment in the form attached hereto as <u>Exhibit "B."</u>

10.   <u>Allocation of Purchase Price</u>.  The Parties agree that the allocation of the Purchase Price is as set forth in <u>Exhibit "A"</u> attached hereto.  The Parties agrees to report the transactions contemplated by this Agreement for all tax purposes (including on tax returns) in a manner that is consistent with this Agreement, and not to take any position inconsistent with such allocation in any tax return or refund claim.

11.  <u>Representations and Warranties of PRM</u>.  PRM represents and warrants to Intercare as follows:

a. <u>Organization.</u>  PRM is a corporation, duly organized, validly existing and in good standing under the laws of the State of California. PRM has no

subsidiaries nor any direct or indirect interest or interests by stock ownership or otherwise in any firm, association or business enterprise. PRM has all requisite corporate power and authority to own and operate its properties and to carry on its business as now conducted.

b. <u>Capital Stock.</u>  All of the outstanding stock of PRM has been duly authorized and is validly issued, fully paid and non-assessable and is free and clear of any security interests, claims, liens, pledges, option, encumbrances, charges, agreements, voting trusts or other arrangements or restrictions. There are no rights, subscriptions, warrants, options, conversion rights or agreements of any kind outstanding to purchase or otherwise to acquire any shares of capital stock of PRM, and there are no securities or obligations of any kind convertible into any shares of capital stock of PRM, except for the capital stock owned by the PRM ESOP, all of which is to be repurchased by PRM under separate agreement to which Intercare is not a party.

c. <u>Foreign Qualifications; California Licenses.</u>  PRM is duly qualified and licensed and in good standing as a foreign corporation duly authorized to transact business in all jurisdictions wherein the character of the properties owned or leased by it or the nature of the activities conducted by it makes such qualification or license necessary.

d. <u>Tax Matters.</u>  PRM has filed all tax returns that it is required to file. All such tax returns were correct and complete in all material respects and were prepared in substantial compliance with all applicable laws and regulations.  PRM has paid all taxes owed. There are no tax liens on any Property. PRM has not waived any statute of limitations in respect of taxes or agreed to any extension of time with respect to a tax assessment or deficiency

e. To PRM's knowledge, PRM has withheld and paid all taxes required to have been withheld and paid in connection with any amounts paid or owing to any employee, independent contractor, creditor, stockholder, other third party, and all Forms W-2 and 1099 required with respect thereto have been property completed and timely filed.

f. No Stockholder, Director or Officer (or employee responsible for tax matters) of PRM expects any authority to assess or otherwise take any action against PRM;

g. Title to Personal Property. PRM owns and has good and marketable title to all of the Property free and clear of any security interest, claims, liens, charges or encumbrances whatsoever.

h. Errors and Omissions Insurance. PRM has been insured for the five (5) year period prior to the Closing Date under standard business insurance policies.

i. Receivables. All accounts receivable of PRM related to the Property are substantially current and fully collectable at the aggregate gross amounts thereof recorded on PRM's books.

j. Commissions. Except as otherwise referred to as the Unpaid PRM Brokers Commissions referred to in Section 4 (b) of this Agreement, all insurance brokerage or agency business placed by all employees of PRM has been placed through and in the name of PRM and all commissions on such business prior to December 31, 2010, have been paid to and are the property of PRM.

k. Legal Proceedings. There are no actions, suits, proceedings or investigations pending or, to the knowledge of PRM, threatened in any court or before any governmental agency or instrumentality against, by or affecting either

PRM or its business, prospects or condition (financial or otherwise) or any of its properties or assets. There are no actions, suits, proceedings or investigations pending or, to the knowledge of PRM, threatened in any court or before any governmental agency or instrumentality which would prevent the carrying our of this Agreement or any of the transactions contemplated hereby or which would declare the same unlawful or cause the rescission of these transactions.

l. Corporate Action. PRM has taken or will take, prior to the Closing Date, all corporate action (including all necessary stockholder action) required authorizing the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions herein will not violate any provision of, or result, in the breach of or accelerate or permit the acceleration of the performance required by the terms of any applicable law, rule or regulations of any governmental body having jurisdiction over PRM, the charter or by-laws of PRM, or any agreement to which PRM is a party or by which any of them may be bound or of any order, judgment or decree applicable to any of them, or result in the creation of any security interest, claim lien, charge or encumbrance upon any of the property or assets of PRM or upon the Property, or terminate or result in termination of any such agreement, or in any way affect or violate the terms or conditions, of, or result in the cancellation, modification, revocation, or suspension of, any of the licenses, approvals, certificates, permits or authorization required under this Agreement.

m. Compliance with Law. PRM has been in full compliance and the business of PRM has been conducted fully in accordance with all laws and regulations applicable to PRM and its business or the ownership or use of its assets.

n. <u>Full Disclosure</u>.  No representation or warranty of PRM and no statement, schedule or certificate furnished or to be furnished by or on behalf of PRM to Intercare or its agents, pursuant to this Agreement or in connection with the transactions contemplated hereby, contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not misleading.

o. <u>Survival of Representations</u>.  The representations and warranties of PRM shall not be affected by any information furnished to, or investigations made by, Intercare or any of its employees, attorneys, accountants or other representatives in connection with the subject matter of this Agreement and shall survive the consummation of the transactions contemplated hereunder for a period of three (3) years after the Closing Date.

12. <u>Representations and Warranties of Intercare</u>.  Intercare represents and warrants to PRM as follows:

a. <u>Organization</u>.  Intercare is a corporation duly organized, validly existing and in good standing under the laws of the State of California.

b. <u>Corporate Authority</u>.  Intercare has full corporate power and authority to execute, deliver and perform this Agreement and has taken all corporate action required by law, their certificates of incorporation, by-laws or otherwise, to authorize the execution and delivery of this Agreement by the person whose signature appears below and the consummation of the transactions contemplated hereby.

c. <u>Good Faith</u>. Intercare, by and through its President, Kevin Hamm, represents that neither Intercare nor Hamm will take any action to assign or otherwise

transfer its assets or liabilities in a manner that would decrease the value of the rights of PRM, Marsh or Steinmeyer under this Agreement.

d. <u>Key Man Insurance on Kevin Hamm</u>. During the term of obligations created by Intercare to PRM and the term of the Consulting Agreements, Intercare shall, at its sole cost and expense, obtain and maintain a life insurance policy on the life of Kevin Hamm in an amount sufficient to pay the remaining unpaid balances off all Intercare obligations payable to PRM, the Marsh and Steinmeyer Consulting Agreements.  Intercare agrees to provide proof of such valid coverage upon request of PRM, Marsh, Steinmeyer or their designees.

e. <u>Building Rental</u>.  Intercare shall remain as a tenant at 6970 Destiny Drive, Rocklin, CA (the "Premises") as a month to month tenant at the present rental rate and related expenses. Intercare agrees to provide PRM with written notice of not less than sixty (60) days notice of its intention to vacate the Premises.

13. <u>Covenants of PRM.</u>  PRM covenants as follows:

a. <u>Corporate Approvals and Consents</u>.  The stockholders of PRM have duly approved by vote or written consent this Agreement and all transactions contemplated hereby and will take all such other action which Intercare shall reasonably deem necessary or appropriate to consummate the transactions contemplated hereby.

b. <u>Non-Competition</u>.  In order to protect the Goodwill, business and Property being purchased pursuant to this Agreement, as well as, the other legitimate interest of Intercare in, among other things, protecting Confidential Information (defined below) and account relationships, PRM agrees to the following covenants, which PRM, Marsh and Steinmeyer acknowledge and agree are

reasonably necessary and tailored to protect Intercare's legitimate business interests:

(i.) For a period of ten (10) years after the Closing Date, PRM, Marsh and Steinmeyer will not, directly or indirectly, compete in any way with the business of Intercare anywhere in the State of California or outside the State of California and will not interfere with the business between Intercare and any client, customer or prospective account of Intercare. For the purpose of this Section 7, the term "compete in any way with the business of Intercare shall mean engaging in or attempting to engage in any business similar to that carried on by Intercare.

(ii.) For a period equal to the longer of: (A) ten (10) years after the Closing Date, or (B) two (2) years following the termination of the Consulting Agreements of Marsh and/or Steinmeyer with Intercare for any reason whatsoever, PRM, Marsh and Steinmeyer, each agree that they not, directly or indirectly, solicit, serve, sell to, divert, receive or otherwise handle insurance-related business with any individual, partnership, corporation, association or other entity that: (x) is, or within that last two (2) years preceding the Closing Date was, a client or customer of PRM or (y) is a Prospective Client (defined below) of PRM.

(iii.) For a period equal to the longer of: (A) ten (10) years after the Closing Date, or (B) two (2) years following the termination of the Consulting Agreements with Marsh and/or Steinmeyer with Intercare for any reason whatsoever, PRM, Marsh and Steinmeyer will not, directly or indirectly, solicit, place, market, accept, aid, counselor consult in renewal, discontinuance or replacement of any insurance, or handle self insurance programs, insurance claims, risk management services or other insurance administrative or service functions for: (x) any account of Intercare (or, as applicable, any of their

affiliates) for which Marsh or Steinmeyer or any stockholder of PRM performed any of the foregoing functions during the two (2) year period immediately preceding the termination of Marsh or Steinmeyer's consulting agreement with Intercare, or (y) any Prospective Client of Intercare.

(iv.)   PRM, Marsh and Steinmeyer and each of them recognize that employees of Intercare are a valuable resource of Intercare and their affiliates and are integral to their full enjoyment of the Goodwill and other Property acquired pursuant to this Agreement. Accordingly, PRM, Marsh and Steinmeyer, and each of them agree that, for a period equal to the longer of (A) ten (10) years after the Closing Date, or (B) two (2) years following the termination of the Consulting Agreement of Marsh or Steinmeyer with Intercare (or, as applicable, any of their affiliates) for any reason whatsoever, PRM, Marsh and Steinmeyer will not, directly or indirectly, solicit, induce or recruit any employee of Intercare or its affiliates to leave the employ of Intercare or its affiliates.

c.  The term "Prospective Client" of Intercare (or, as applicable, any of its affiliates) means any entity (other than a then-current account of Intercare, or, as applicable, any of their affiliates) with respect to whom, at any time during the one (1) year period preceding the termination of the Consulting Agreements of Marsh and/or Steinmeyer, Intercare (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of (or, as applicable, any of their affiliates), or (ii) had material contact or acquired or had access to Confidential Information as a result of or in connection with such employment with Intercare (or, as applicable, any of its affiliates).

d.  The term "Confidential Information" includes, but is not limited to, data relating to Intercare's and its affiliates' unique marketing and servicing programs, procedures and techniques; retirement plan consulting, variable annuities, and

fund investment business and related products and services; business, management and personnel strategies; details of salary, bonus and other compensation arrangements, the criteria and formulae used by Intercare and, as applicable, its affiliates in pricing their respective insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages that Intercare and its affiliates have negotiated with various underwriters; lists of prospects compiled by Intercare's and its affiliates management and research staff; the identity, authority and responsibilities of key contacts at Intercare accounts and accounts of it affiliates, including accounts of the Book of Business; the composition and organization of accounts' businesses; the peculiar risks inherent in their operations; highly sensitive details concerning the structure, conditions and extent of their existing insurance coverages; policy expiration dates; premium amounts; commission rates; risk management service arrangements; loss histories; candidate and placement lists; and other data showing the particularized insurance requirements and preferences of the accounts. PRM, Marsh and Steinmeyer recognize that this Confidential Information constitutes a valuable property of Intercare and its affiliates developed over a long period of time and at substantial expense, and acknowledge Intercare's legitimate interest in safeguarding the Confidential Information from disclosure. Accordingly, PRM, Marsh and Steinmeyer, and each of them, agree that they will not, at any time, directly or indirectly, divulge such Confidential Information or make use of it for their own purposes or the purposes of another.

e. PRM, Marsh and Steinmeyer agree that, in the event of a breach of the provisions of this section, the time period specified in such provisions shall be extended by the number of days between the date of such breach and date such breach is enjoined or other relief is granted to Intercare or any of its affiliates by a

court of competent jurisdiction. It is the intention of the parties that Intercare or any of its affiliates shall enjoy the faithful performance by PRM, Marsh and Steinmeyer.

f. PRM, Marsh and Steinmeyer, each acknowledge that it would be difficult to measure damage to Intercare and its affiliates from any breach by of the covenants set forth in this section, that injury to Intercare and its affiliates from any such breach would be incalculable and irremediable, and that money damages would therefore be an inadequate remedy for any such breach. Accordingly, PRM, Marsh and Steinmeyer agree that in the event of a breach of any of them, Intercare and its affiliates shall be entitled to enforce this section and shall be entitled, in addition to all other legal and equitable remedies they may have, to a temporary restraining order and to preliminary and permanent injunctive relief (without posting any bond or other security) to restrain any such breach by without showing or providing any actual damage sustained by Intercare or its affiliates. PRM, Marsh and Steinmeyer will indemnify Intercare or its affiliates and hold Intercare or its affiliates harmless against any loss, cost, liability or expense (including lost profits, attorneys' fees and other costs) incurred by Intercare or their affiliates by reason of the breach or non-fulfillment of any obligation contained in this section. PRM, Marsh and Steinmeyer further agree that if any of them breaches this section, Intercare and its affiliates shall be entitled, in additions to all other legal or equitable remedies they may have, to offset and withhold against any such loss, cost, liability or expense any and all amounts of any kind that may then be owing or payable to PRM, Marsh or Steinmeyer under this Agreement or otherwise, to the extent such loss, cost, liability or expense is properly attributable to the party suffering the offset.

g. To the extent that any of the covenants set forth in this section or any word, phrase, clause, or sentence thereof   (including any geographical or temporal restrictions contained in such covenants) shall be found illegal or unenforceable for any reason, such word, clause, phrase or sentence shall be modified or deleted in such manner so as to afford Intercare and their affiliates the fullest protection commensurate with making the covenant, as modified, legal and enforceable under applicable laws, and the balance of the covenants, or parts thereof, shall not be affected thereby, the balance being construed as severable and independent.

h. Indemnification.   Without limiting any other rights or remedies Intercare may have, PRM shall indemnify and hold harmless Intercare and its affiliates, subsidiaries, officers, directors, employees and agents (collectively "Buyer Indemnitees"), against all loss, cost, claim, damage, liability or expense (including reasonable attorneys' and accountant's fees, costs of suit and costs of appeal) incurred by any Buyer Indemnitee in connection with or arising out of any of the following:

(i.)  All liabilities of PRM not assumed by Intercare of any kind or nature to the extent not expressly assumed by Intercare pursuant to this Agreement;

(ii.)  The inaccuracy or falsity of any representation or warranty made by PRM, Marsh or Steinmeyer or any breach by any of them of any covenant made in this Agreement; and

(iii.)  Any claim, action, suit or proceeding filed or threatened against any Indemnitee incident to or arising out of any of the foregoing and all costs and expenses incurred in connection therewith, including accounting and legal fees, costs of suit and costs of appeal.

(iv.)  Similarly, without limiting any other rights or remedies PRM, Marsh or Steinmeyer may have, Intercare shall indemnify and hold harmless PRM, Marsh and Steinmeyer, their affiliates, subsidiaries, officers, directors, employees and agents (collectively "Seller Indemnitees"), against all loss, cost, claim, damage, liability or expense (including reasonable attorneys' and accountant's fees, costs of suit and costs of appeal) incurred by any Seller Indemnitee in connection with or arising out of any of the following:

(a)  All liabilities of Intercare assumed by PRM, Marsh and  Steinmeyer of any kind or nature to the extent not expressly assumed by PRM, Marsh and Steinmeyer pursuant to this Agreement;

(b)  The inaccuracy or falsity of any representation or warranty made by Intercare or any breach by it of any covenant made in this Agreement; and

(c)  Any claim, action, suit or proceeding filed or threatened against any Seller Indemnitee incident to or arising out of any of the liabilities expressly assumed by Intercare herein, including accounting and legal fees, costs of suit and costs of appeal.

i.  Notice of Claim.  With reasonable promptness after the receipt of notice of the assertion or commencement of any claim or lawsuit which would result in liability on the part of PRM, Marsh or Steinmeyer with respect to an indemnification obligation arising under this Agreement, Intercare will make reasonable efforts to notify PRM to permit them, at their expense, to participate in all negotiations, litigation, discovery and related matters, and to assume the defense thereof.

14. <u>PRM's Deliverables at Closing</u>.   The obligations of Intercare under this Agreement are, at the option of Intercare subject to delivery, at or prior to the Closing Date, of the following items:

a. <u>PRM's Resolutions</u>.   A certified copy of resolutions adopted by PRM's board of directors approving the sale, transfer and delivery of the Property to Intercare for the consideration and upon the terms and conditions provided for in this Agreement.

b. <u>Bill of Sale</u>.  PRM shall have executed the Bill of Sale and Assignment with respect to the sale of the Property.

c. <u>Other Documents.</u>   Intercare shall have received such other certificates, documents and instruments, including, but not limited to, the consent to assign the Assumed Liability to Intercare from the current holder of the Assumed Liability, as counsel for Intercare shall reasonably conclude are required to consummate the transactions contemplated by this Agreement.

15. <u>Remedies Not Exclusive and Waiver</u>.  No remedy conferred by any of the specific provisions of this Agreement is intended to be exclusive of any other remedy and each remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or otherwise. No remedy shall be deemed to be a limitation on the amount or measure of damages resulting from any breach of this Agreement. The election of anyone or more remedies shall not constitute a waiver of the right to pursue other available remedies. Any party hereto may waive any covenant, condition or provision of this Agreement intended for its benefit, provided such waiver is in writing and is delivered to the other party on or prior to the Closing Date.

16. <u>Governing Law</u>.  This Agreement shall be construed and interpreted under, and governed and enforced according to, the laws of the State of California, without giving effect to the conflict of laws and rules thereof.

17. <u>Scope of Agreement</u>.   This Agreement constitutes the entire agreement between the Parties and no representation, warranty, condition, understanding or agreement of any kind shall be binding on the parties unless incorporated herein. Each party has been independently advised of the tax and accounting consequences of this transaction, has relied on the advice of its own counsel and accountants, and has not relied in any way upon any representations, warranties, or advice in these matters from any of the other parties. No provision in this Agreement shall be construed to constitute any party (or the officers, directors or employees thereof) the agent or general partner of any other party or confer upon them the right to contract in the name of or bind such other party in any way. This Agreement may not be modified except by an agreement in writing signed by the party against whom the enforcement of any waiver, change, modification or discharge is sought. The Agreement shall survive the execution of any instruments executed pursuant to the terms hereof. This Agreement may not be assigned by any party hereto without the express written consent of the other parties hereto; provided, however, Intercare may assign its rights and obligations under this Agreement to any entity under common control with Intercare. Subject to the preceding sentence, this Agreement shall inure to the benefit of and be enforceable by the Parties hereto, their respective heirs, executors, administrators, successors and assigns.

18. <u>Rule of Construction</u>.  The Parties agree that each party and its counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall

not be employed in the interpretation of this Agreement or any amendments or exhibits hereto.

19. <u>Notices</u>. All notices, requests, demands, claims and other communications hereunder shall be in writing. Any notice, request, demand, claim or communication hereunder shall be deemed duly given when delivered personally to the recipient, 1 business day after being sent to the recipient by reputable overnight courier service (charges prepaid), or 4 business days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, to the intended recipient as set forth below:

<u>As to Intercare</u>:

Kevin Hamm, President
6970 Destiny Drive
Rocklin, CA 95677

<u>With a Copy To</u>:

David Shafer
The Shafer Law Group
210 Magnolia Ave
Auburn, CA 95603

<u>As to PRM</u>:

Gene Marsh, President
PRM Insurance Services
3802 Heather Court
Rocklin, CA 95765
email: <u>genemarsh36@yahoo.com</u>

<u>As To Marsh</u>:
Gene Marsh
3802 Heather Court
Rocklin, CA 95765
email: <u>genemarsh36@yahoo.com</u>

With a copy to
Mark Shusted, Esq.
email: marksshusted@gmail.com

As to Steinmeyer:
P.O. Box 4050
Incline Village, NV 89450
email: dpsteinmeyer@aol.com

With a copy to
Mark Shusted, Esq.
email: marksshusted@gmail.com

Or any other address requested by a party in writing.

20. Fees and Expenses. Intercare and PRM shall each pay their own expenses, including, but not limited to, legal and accounting expenses incident to the execution of this Agreement and the consummation of the transactions contemplated hereby whether or not such transactions shall be consummated.

21. Further Assurances. From time to time following the Closing Date, PRM, Marsh and Steinmeyer shall execute and deliver, or cause to be executed and delivered, to Intercare, and Intercare shall execute and deliver, or cause to be executed or delivered, to PRM, Marsh or Steinmeyer, such other instruments of conveyance and transfer as one or more of these parties may reasonably request or as may be otherwise necessary to more effectively convey and transfer to, and vest in, Intercare possession of, any part of the Property, and, in the case of licenses, certificates, approvals, authorizations, agreements, contracts, leases, easements and other commitments included in the Property (a) which cannot be transferred or assigned effectively without the consent of third parties which consent has not been obtained prior to the Closing Date, to cooperate with each

other at its request in endeavoring to obtain such consent promptly, and if any such consent is unobtainable, to use its commercially reasonable efforts to secure to Intercare the benefits thereof in some other manner, or (b) which are otherwise not transferable or assignable, to use its commercially reasonable efforts jointly with Intercare to secure to Intercare the benefits thereof in some other manner; provided, however, that nothing herein shall relieve PRM, Marsh or Steinmeyer under this Agreement.   Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any license, certificate, approval, authorization, agreement, contract, lease, easement or other commitment included in the Property if an attempted assignment thereof without the consent of a third party thereto would constitute a breach thereof.

22. Time is of the Essence.  With respect to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

23. Submission to Jurisdiction/Attorneys Fees.  The Parties irrevocably submit in any suit, action or proceeding arising out of or related to this Agreement or any of the transactions contemplated hereby or thereby to the jurisdiction of the federal and state courts located within Placer County, California and waive any and all objections to jurisdiction that they may have under the laws of the State of California. In the event of an action at law or in equity between the parties hereto to enforce any of the provisions hereof, the unsuccessful party to such litigation or proceeding shall pay to the successful party all costs and expenses, including reasonable attorneys' fees, incurred therein by such successful party on trial and appeal as adjudged by the court, and if such successful party or parties shall recover judgment in any such action or proceeding, such costs, expenses and attorneys' fees may be included as part of such judgment.

*[Signature on following page]*

IN WITNESS WHEREOF, the parties have executed this
Agreement as of the Effective Date.

**Intercare:**                                  **PRM:**

Intercare Specialty Risk Insurance Services, Inc.    PRM Insurance Services, a California
corporation

By: Kevin Hamm
Its: President
Dated: 2/14/11

By: Gene Marsh,
Its: Chief Executive Officer
Dated: 2/11/2011

Gene Marsh, Individually
Dated: 2/11/2011

Donald P. Steinmeyer
Chairman of the Board of PRM
Dated:

By: Donald P. Steinmeyer, Individually
Dated: 2/15/11

EXHIBIT "A"

## Allocation of Purchase Price

To be determined by Intercare after conferring with Intercare CPA.

Case 2:17-cv-01347-MCE-EFB  Document 1-1  Filed 06/30/17  Page 30 of 31

## EXHIBIT "B"

## Bill of Sale and Assignment

For good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, and as contemplated by Section 1 of that certain Purchase Agreement with the effective date of December 31, 2010 ("Agreement") to which PRM Insurance Services, Inc, a California corporation ("Corporation") and Intercare Specialty Risk Insurance Services, Inc., a California corporation ("Intercare") are parties, Corporation hereby sells, transfers, assigns, conveys, grants and delivers to Intercare, on December 31, 2010 (the "Effective Date"), all of Corporation's right, title and interest in and to all of the property (the "Property") described on Schedule "A" attached hereto and made a part hereof. Capitalized terms used and not described herein shall have the respective meanings assigned to them in the Agreement.

Corporation covenants and agrees to warrant and defend the sale, transfer, assignment, conveyance, grant and delivery of the Property hereby made against all persons whomsoever, to take all steps reasonably necessary to establish the record of Intercare title to the Property, and, at the request of Intercare, to execute and deliver further instruments of transfer and assignment and take such other action as Intercare may reasonably request to more effectively transfer and assign to and vest in Intercare the Property, all at the sole cost and expense of Corporation.

In addition to such other representations and warranties contained in the Agreement, Corporation hereby represents and warrants to Intercare that immediately prior to the execution hereof, Corporation had, and upon the execution hereof, Intercare is acquiring and is vested with good, valid and marketable title to the Property, free and clear of any encumbrances whatsoever.

The terms of the Agreement, including but not limited to Corporation's representations, warranties, covenants, agreements and indemnities relating to the Property, are incorporated herein by reference. Corporation acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Agreement shall not be superseded hereby, but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Agreement and the terms hereof, the terms of the Agreement shall govern.

The Bill of Sale and Assignment shall be binding on Corporation and the successors and assigns, and shall inure to their benefit.

IN WITNESS WHEREOF, Corporation has executed this Bill of Sale and Assignment as of December 31, 2011.

"Corporation"

PRM Insurance Services, Inc
By: Gene Marsh, President

30

## SCHEDULE A

All of the assets, personal property, business and goodwill of Corporation of every kind, nature and description, wherever located, as it exists on the Closing Date, including the assets, property and business, wherever located, described below:

(a) All of the right, title and interest of Corporation in its insurance brokerage and insurance agency business and in its insurance counseling, safety planning, insurance program management, insurance claims adjusting and processing and related services businesses (collectively the "Acquired Businesses") and all of its customer lists, expirations, renewal rights, insurance company and broker relationships and agreements, and accounts and all books and records, correspondence, files and other data wherever located pertaining to the Acquired Businesses. The Acquired Businesses shall include customer lists, renewal rights, claims, commissions, agreements and contracts relating to the Acquired Businesses which are held, owned or standing in the name of any officer, employee, agent, stockholder or director of Corporation, irrespective of the legal title to any of such property.

(b) All furniture, fixtures, equipment, automobiles and leasehold improvements of Corporation.

(c) All of the right, title and interest of Corporation in and to the name PRM Insurance Services, Inc. or any variant thereof including the goodwill attached thereto.

(d) The sole right to collect and to retain (i) all insurance commissions (including gross retained commissions realized from premiums collected) due Corporation, irrespective of the attachment date or billing date of the insurance policies to which such commissions relate and whether billed to client by Corporation or directly billed to client by the insurance carrier, (ii) all service fees due Corporation for any services rendered in connection with the operation of the Acquired Businesses and collected on and after the Balance Sheet Date as defined below, by Corporation or by INTERCARE and (iii) all other commissions, fees or other compensation paid, payable or due to Corporation irrespective of the date as of which such commissions, fees or other compensation was accrued or earned.

(e) The sole right to collect and retain (i) all contingent commissions or similar compensation due to Corporation or Intercare on and after the Balance Sheet Date from insurance underwriters in connection with contracts or other arrangements in effect on the Closing Date providing for such payments to Corporation, and (ii) all return premiums or other payments (return or otherwise) due to Corporation from insurance companies.

(f) All of Corporation's right, title and interest in and to the leases and other contracts and agreements;

(g) All other property, personal, tangible and intangible, of Corporation, including cash and securities, bank accounts, accounts receivable of all types and all of Corporation's right, title and interest in and to all claims, licenses, trademarks, trade names copyrights, websites, URLs and memberships (to the extent such are assignable) of Corporation.

Notwithstanding the foregoing, the following shall be excepted from the term "Property" as used in this Agreement and shall not be included in the assets sold to Intercare pursuant to this Section 1: (i) the minute books, stock ledgers and stock transfer records of Corporation; (ii) this Agreement and all documents to be delivered by Intercare to Corporation hereunder.

31