Peter Dunn Lemmon, Esq., Ca. Bar No. 138691
Law Offices of Peter Dunn Lemmon
210 Magnolia Avenue, Suite 2
Auburn, California 95603
Email: peter@pdllaw.com
Telephone: 530.265.6100
FAX: 530-264-8448
Attorneys for Defendants Intercare Specialty Risk Insurance Services, Inc.,
aka ISR Holdings, Inc.

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| KAREN RIGSBY, Trustee of the MARSH REVOCABLE TRUST OF 2003, and DONALD P. STEINMEYER, an individual, <br><br> Plaintiff(s), <br><br> vs. <br><br> INTERCARE SPECIALITY RISK INSURANCE SERVICES INC., A California Corporation; ISR HOLDINGS, INC., a California Corporation; KEVIN HAMM, an individual; and PATRIOT NATIONAL, INC., A Florida Corporation. <br><br> Defendant(s). | Case No.: 2:17-cv-01347-MCE-EFB <br><br> DECLARATION OF KEVIN HAMM IN OPPOSITION TO PLAINTIFFS' APPLICATION FOR RIGHT TO ATTACH ORDER AND WRIT OF ATTACHMENT <br><br> Date: October 5, 2017 <br> Time: 2:00 PM <br> Courtroom: 7 |

I, KEVIN HAMM, declare:

1.      I am the President and Chief Executive Officer (CEO) of ISR Holdings, Inc. ("ISR"), a California Corporation formerly named Intercare Specialty Risk Insurance Services, Inc.

2.      ISR was founded in 2009 and is headquartered in Rocklin, California. ISR is a retail insurance brokerage that provides insurance products (e.g. Worker's Compensation, Medical Professional Liability, Property & Liability, Employee Health Benefits, and Life & Retirement

Options); services and risk management solutions to commercial clients. ISR's market is concentrated in the Health Care Industry, and its primary customer base consists of skilled nursing facilities, surgery centers, physicians' offices, managed care, and cost containment companies. ISR has approximately 43 full-time employees and annual revenues of $15,000,000.00.

## I.

## BACKGROUND

3. Intercare and PRM, while separate companies, had operated out of the same building in Rocklin, California. In 2010, Intercare offered wholesale and retail insurance products and PRM offered wholesale-only Worker's Compensation insurance products.

4. By way of background, Plaintiffs Marsh and Steinmeyer were the owners of PRM. Previously, I had a long professional and personal relationship with Marsh, who has since died. Plaintiff, Karen Rigsby, is Gene Marsh's daughter and Trustee of his Trust.

5. For the eighteen (18) months prior to purchasing PRM and concurrent with my position as President of Intercare, I also served as the sales manager of PRM.

## II.

## ASSET PURCHASE AGREEMENT

6. In December, 2010 Intercare merged with PRM Insurances, Inc. ("PRM") pursuant to an Asset Purchase Agreement ("APA"). The agreement was for Intercare to acquire "the entire book of business and goodwill of PRM" as an asset purchase because of the large unfunded liabilities of PRM, primarily for unpaid broker commissions. Intercare restricted its assumption of liability for "the unpaid PRM Broker Commission limited to $400,000 for business booked prior to 12/31/ 2009." The APA was entered into by and between the following parties:

— Intercare Speciality Risk Insurance Services, Inc. a California Corporation ("Intercare")

— PRM Insurance Services, a California Corporation ("PRM")

— Gene Marsh as officer, director and stockholder of PRM ("Marsh"), and

— Donald Steinmeyer as officer, director and stockholder of PRM ("Steinmeyer")

7. A true and correct copy of the Asset Purchase Agreement ("APA") is attached

hereto as Exhibit A.

III.

CONSULTING CONTRACT

8.     Attached hereto as Exhibit B is a true and correct copy of the Consultant Agreement with Gene M. Marsh (Marsh Agreement). The Marsh Agreement dated December 31, 2010 was between Intercare and executed by Gene Marsh, Consultant on February 11, 2011. The Consulting Term of ten (10) years with the attached duties under the Marsh Agreement began January 1, 2011 and was to end December 31, 2021.

9.     Attached hereto as Exhibit C is a true and correct copy of the Consultant Agreement with Donald P. Steinmeyer dated December 31, 2010, between Intercare and executed by Donald P. Steinmeyer ("Consultant"), on February 11, 2011. The term of the agreement begins on January 1, 2011 and ends on December 31, 2021. The sole compensation for the performance of the services provided by "Consultant" shall be $1,482.00 per month throughout the ten-year term.

IV.

ALLEGATIONS OF ALTER EGO DENIED

10.     Subsequent to the APA, Intercare changed its name to ISR Holdings, Inc. ("ISR"). During all related dealings and relevant times, Intercare and ISR Holdings have maintained all legal and corporate requirements for maintenance as a separate and distinct legal entity; performed all continuing corporate maintenance of filings, meetings, and minutes. I strongly dispute Plaintiffs' allegations Intercare and ISR are, or have been, my "alter ego." (See Declaration of Attorney David Shafer, filed concurrently herewith.)

V.

BREACH OF APA

11.     Over time and continuing presently, I have discovered that Steinmeyer and Marsh breached the APA in a number of ways, including: 1) Failing to disclose the extent and nature of the old broker commissions owed by PRM; 2) Failing to disclose the accounting system sold to Intercare was programmed to pay off PRM's old broker commission debts with current Intercare

cash flow; and, 3) Failing to notify Intercare that they had received more money than they were entitled.

VI.

INTERCARE'S OVERPAYMENT OF UNPAID PRM BROKER PAYMENT COMMISSIONS

12.     As an asset-only purchase, Intercare did agree to assume a very limited list of debts, including most importantly, limiting "old broker commissions" of PRM to $400,000.

13.     The APA states, "... the unpaid PRM Broker Commission limited to $400,000 for business booked prior to 12/31/2009..." (APA, Paragraph 2.a.ii.p.4)

14.     It was PRMS's practice to collect entire annual premiums, a large portion of which was due the brokers who had sold the insurance product, but PRM would not pay the brokers their commission. Instead, PRM would pay its operating expenses and then its shareholders, Steinmeyer and Marsh, and ignore the brokers, resulting in large amounts owed to the brokers. In doing this, I learned in 2015, PRM believed over time certain brokers would fail to demand all commissions due them; or their claims would become stale and uncollectable. (See Paragraph 2 of January 17, 2015 email from Don Steinmeyer to me attached hereto as Exhibit "D").

15.     At the time of the APA in December of 2010, PRM was not able to account for unpaid commissions and therefore Intercare's liability was to be limited to $400,000.

16.     What I did not know at the time of the APA was what PRM did not disclose, and that was the accounting system PRM sold to Intercare, One Source, was programmed to pay off PRM's old broker commission debts with new income from Intercare's cash flow. When we learned of this in 2015, we requested that Steinmeyer and Marsh take the overpayment into account in any future payments to them, since those were PRM liabilities Intercare had explicitly refused to take on in the Agreement. But Steinmeyer and Marsh would not agree.

17.     As a result, Intercare and ISR Holdings has overpaid at least an additional $467,420.12 over its $400,000 limitation.

## INTERCARE'S OVERPAYMENT OF "ADMINISTRATION EXPENSE" FUND

18. The "Administration Expense" called for in the Agreement had been substantially over paid by the accounting default which had been programmed by Don and/or Gene or their employees at PRM. (See APA, Exhibit "A", pg.11, #8.)

19. The "Administrative Expense" was to cover legal bills expected to cover PRM employees' grievances with the dissolution of an ESOP plan as an employee benefit, and by a potential bankruptcy of PRM, provided and planned by Don and Gene in the event broker debt obligations exceeded the $400,000 ISR\Intercare had agreed to cover in the Agreement and/or employees' claims became too great. I and ISR requested and demanded of PRM an accounting or some other way of determining what claims had been paid and, therefore, whether the obligations (employee claims and legal fees to defend against them) would have to be continued, Steinmeyer ignored my request, despite the fact Section 8 "Administration Expenses" states, in pertinent part:

> "*Payments* by Intercare under this Section 6 [sic] *may be terminated by Intercare* prior to the payment terms identified herein *if the obligations payable as PRM Administration Expenses are satisfied* before the end of the stated term." (Emphasis added.)

20. The "Administration Expense" was only an allowance for expenses incurred and while ISR continued to pay into that fund, there were few, if any, expenses and no accounting by Steinmeyer or Marsh for any expenses. Instead, those dollars were presumably spent by Marsh and Steinmeyer personally.

21. Intercare paid $149,000 into the "Administration Expense" fund. That is money owed to Intercare by Cross-Defendants.

## VIII.

### DISPUTE

22.     I came to an awareness of these various breaches over time due to a downturn in the overall company business and because of my personal friendship and feelings for Gene Marsh. I simply did not believe Gene, a long time personal friend and mentor, would have been party to such conduct.

23.     In approaching Marsh and Steinmeyer with various contractual disputes, there were various modifications agreed to in the monthly payments under the consulting agreements.

24.     One such dispute was over the Seabright Profit Sharing Fund for premiums written by PRM through December 31, 2010. (APA, Exhibit "A", Paragraph 5, p. 8.) Under the terms of the APA, in 2012, Intercare expected an accounting from Seabright together with a profit sharing check of several hundred thousand dollars, as this was represented by Steinmeyer.

25.     Instead, Seabright asserted "hold backs" for old losses of PRM of $129,168.56 in November, 2011 and $135,104.34 in February, 2012 for a total damage to Intercare of $264,272.90.

26.     As one consequence, Gene Marsh told Intercare not to pay $65,000 in payments to Steinmeyer and Marsh to provide some relief to Intercare.

27.     Plaintiffs completely ignore this modification and claim this $65,000 as a right to attach order.

28.     In July of 2015 another modification was reached, reducing the monthly payments to Steinmeyer and Marsh. (See email defining and confirming the Modification dated July 9, 2015 attached as Exhibit E.)

29.     Another modification was reached only 8 days later to defer one monthly payment each year. (See email confirming same dated July 17, 2016, attached as Exhibit F.)

30.     Plaintiffs ignore these modifications as well.

### IX.

31.     Attached hereto as a complete Exhibit "G" are a series of emails reflecting both the business difficulties of Intercare and contractual disputes being experienced between the parties as I was attempting to come to some resolution with Plaintiffs:

— September 1, 2013          Re: September Payments.  Here we simply let Plaintiffs know things are highly impacted by the loss of Seabright, and we will resume payments when we can.

— February 1, 2014          Re:  Gene Marsh- Subordination Agreement.  We explain that again, because of the loss of Seabright and related programs, we are working to attract replacement markets and need financing to continue running the business, so we must have Plaintiffs subordinate their claims to new financing.

— January 13, 2015          Re:  Phone calls with Kevin.  Here, Gene Marsh explains that because of his health, he has "given his proxy" to Don Steinmeyer, and Gene and I share our concerns for each other, including the fact we have been unable to make payments due to several factors outside ISR's control, including Mr. Steinmeyer's acknowledgment of, among other disagreements about the deal, that the "basis of our contract . . . was the more than $300K in profit . . . as well as what we thought the contribution from Sea Bright would be."

— January 17, 2015          Re: 1/15/2015 Phone Conversation.  Here, Mr. Steinmeyer reveals his hidden plan to cheat the brokers out of their commissions (See Paragraph 2), a plan he had never revealed in 2010.  Otherwise, Mr. Steinmeyer goes through the primary areas of dispute and denies ISR and I have anything to complain about.

— March 31, 2015          Re:  Greetings.  Here, Mr. Marsh disputes ISR's payments to him for the airplane lease ought to have been terminated—even though he no longer owned his plane.  I responded that there were overpayments on the broker commissions, etc. and that we were not going to "short" you "until the numbers were clearly outlined and we had communicated a plan."  That "plan" was what led to the modification of July of 2015.

— July 1, 2015          Re:  APA Breach.  I laid out that I was ready to meet with

Gene and Don, or Don alone, to go over all the issues and come up with a "plan" we could all live with going forward.

— July 8, 2015          Re: FW:PRM Purchase Modifications. This was the modification resulting from the conversation about all the problems.

— July 9, 2015          Re: Steinmeyer 1099's. I don't remember what this was about.

— July 10, 2015          (No subject). Don Steinmeyer admitting that my success "is our only security in this matter".

— February 5, 2016          Re: FW: ESOP Notice. I do not recall what this was regarding.

— February 16, 2016          Re: APA Modification payments. This was Mr. Steinmeyer attempting to obtain even more money from ISR on the basis that Mr. Marsh, who had passed away the weekend before, wanted him to have more money and Gene's heirs less.

— February 23, 2016          (No subject). This was my attempt to make sure Mr. Marsh's heirs were in agreement with Mr. Steinmeyer getting more money and them getting less. Mr. Steinmeyer's response was that he did not want to have to ask Mr. Marsh's wife, and he was not at all sure "about [Marsh's] daughter. " . . . I am quite sure you don't want to go there either. I don't think it in either of our interest to open up our settled modification to an unknown like this."

—February 26, 2016          Re: Gene Marsh. This is Don Steinmeyer stating why he does not need to obtain Gene's heirs' approval or agreement.

— August 13, 2016          Re: Modification Agreement to the APA. This email confirms the performance by us of the payments under the modification agreement and subsequent furlough agreement.

— September 9, 2016          (No subject). This is Mr. Steinmeyer stating that for late payments it is a problem for him as to Mr. Marsh's wife and daughter that he has " . . . to deal with non business experience [sic] 'little old ladies.' We have to keep them on the reservation."

— December 19, 2016     Re: PRM. This is Mr. Steinmeyer threatening litigation because of "missed payments" in October, November and December of 2016.

— August 7, 2017     Re: Your email/ Legal Filing. This is me writing to Gene's daughter, Karen, after she has filed this lawsuit. I reached out to try to resolve the matter, explaining that her email to me had not been sent to the right email address, and that is why I did not see it until I saw it attached to her complaint against me. I explained that our financial constraints did not enable us to make payments, that I would never shirk my obligations, and that our financial situation simply did not allow us to do more at this time. This was my attempt to start a conversation, but, sadly, Karen Rigsby merely referred me to her attorneys.

X.

CONCLUSION

32.     A good faith dispute on several fronts has existed which has never been resolved, and it is dependent upon an accounting of all the payments made to Steinmeyer and Marsh, including the hundreds of thousands of dollars ISR has paid for obligations Plaintiffs forced upon ISR without us knowing. Though we are in the midst of investigating these amounts, they are at least as follows: (A) $467,420.12 over the cap for PRM old broker commissions; (B) $102,000 in airplane lease payments when there was no longer any airplane or lease; (C) $199,000 in Seabright charge backs (instead of profit sharing to ISR as Steinmeyer represented and promised); and, (D) at least $149,000 in "Administration Expenses" we should not have had to pay -- for a total of at least $917,420.12 owed by Steinmeyer and Marsh to ISR.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own personal knowledge, and that I can and will competently testify thereto if called as a witness.

Executed at Auburn, California
September 20, 2017

Kevin Hamm